******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* JASMINE LAMANTIA
## (SC 20190)

Robinson, C. J., and Palmer, McDonald, D'Auria,
Mullins, Kahn and Ecker, Js.*

*Syllabus*

Convicted, after a jury trial, of the crime of tampering with a witness, the defendant appealed to the Appellate Court, claiming, inter alia, that there was insufficient evidence to support her conviction. The defendant's boyfriend, R, and her former boyfriend, M, had engaged in an altercation outside of her home. M, who was injured, called the police, after which R left the premises. A state police officer who responded to the scene spoke with M in the presence of the defendant, and M told the officer that he had been assaulted by R and another person who was with R at the time. The officer then went to R's residence, where R showed him his cell phone and told him that he should read the text messages between the defendant and R. In those text messages, the defendant informed R that the police were coming and instructed R to have blood on his clothes. The defendant further told R that M had reported to the police that R attacked him but that the defendant's statement to the police was that M was bloody when he arrived at her home because he was in a bar fight somewhere else. The defendant directed R to tell the police that M stalks her and emphasized that they needed to stick to the same story. The officer subsequently confronted the defendant about the text messages, and she stated that the text messages were taken out of context. At trial, however, the defendant denied sending the text messages. The Appellate Court upheld the defendant's conviction, concluding that the jury reasonably could have found that the defendant tampered with a witness, R, by sending him text messages shortly after his altercation with M. On the granting of certification, the defendant appealed to this court, claiming that the Appellate Court improperly had upheld her conviction because there was insufficient evidence from which a jury reasonably could find that she had specifically intended to interfere with a witness' testimony at an official proceeding. *Held* that the Appellate Court correctly determined that the jury reasonably could have found that the defendant tampered with a witness when she sent R text messages shortly after his altercation with M: the jury reasonably could have inferred that, when the defendant sent the text messages to R, she believed that an official proceeding was pending or was about to be instituted at which R would likely be a witness, as there was evidence presented at trial that the defendant knew of and contributed to the investigation of the altercation, knew there were witnesses to the altercation, including herself, knew there was physical evidence of the altercation, namely, M's injuries, knew the police were taking M's complaint against R seriously, and knew that the police were interested in contacting R regarding the altercation; moreover, the jury also reasonably could have inferred that the defendant induced or attempted to induce R to testify falsely at that proceeding, as there was evidence that the defendant knew that R was a critical witness to the altercation under investigation and that she had instructed R on how to fabricate his statement to the police so that it would match with her statement, and the defendant's own false testimony before the jury regarding the nature of her relationship with R and her denial that she ever had sent the text messages in question to R reasonably could have led the jury to infer that, because she had no qualms about giving false testimony herself, she intended for R to do the same when it was his turn to testify.

(*Three justices dissenting in two separate opinions*)

Argued October 16, 2019—officially released September 3, 2020**

*Procedural History*

Substitute information charging the defendant with the crimes of interfering with a police officer and tam-

pering with a witness, brought to the Superior Court in the judicial district of New London, geographical area number twenty-one, and tried to the jury before *A. Hadden, J.*; verdict and judgment of guilty, from which the defendant appealed to the Appellate Court, *DiPentima, C. J.*, and *Alvord* and *Pellegrino, Js.*, which reversed in part the trial court's judgment and remanded the case to that court with direction to render judgment of not guilty on the charge of interfering with a police officer, and the defendant, on the granting of certification, appealed to this court. *Affirmed.*

*Conrad Ost Seifert*, assigned counsel, for the appellant (defendant).

*Melissa L. Streeto*, senior assistant state's attorney, with whom, on the brief, were *Michael Regan*, state's attorney, and *Christa L. Baker*, assistant state's attorney, for the appellee (state).

*Opinion*

KAHN, J. The defendant, Jasmine Lamantia,[1] appeals from the judgment of the Appellate Court affirming the judgment of conviction, rendered after a jury trial, of tampering with a witness in violation of General Statutes § 53a-151 (a).[2] *State* v. *Lamantia*, 181 Conn. App. 648, 671, 187 A.3d 513 (2018). The defendant claims that the Appellate Court incorrectly concluded that there was sufficient evidence to permit a jury to reasonably infer that, when she sent text messages to her boyfriend, Jason Rajewski, after his altercation with David Moulson, the defendant had the specific intent to interfere with a witness' testimony at an official proceeding. Specifically, the defendant contends that there was no evidence to infer that she thought it was more probable than not that a future criminal trial would occur, or that she thought Rajewski would probably testify at such a trial. The state responds that the evidence was sufficient to prove beyond a reasonable doubt that the defendant intended to induce Rajewski to testify falsely in an official proceeding that she believed to be imminent. We conclude that the Appellate Court correctly determined that the jury reasonably could have found that the defendant tampered with a witness by sending Rajewski text messages shortly after his altercation with Moulson. Accordingly, we affirm the judgment of the Appellate Court.

From the evidence presented at trial, the jury could have reasonably found the following facts.[3] On the evening of July 24, 2015, Earl F. Babcock and Rajewski socialized for three or four hours at a bar in Norwich. At that time, the defendant was in a romantic relationship with Rajewski.[4] At some point in the evening, the defendant also arrived at the bar where Babcock and Rajewski were socializing. After midnight and in the early morning hours of July 25, 2015, at the defendant's suggestion, Babcock and Rajewski, in Babcock's car, followed the defendant from the bar to a house located at 18 Bunny Drive in Preston, where some teenagers, including the defendant's son, Joshua Bivens, were having a party. When they arrived, the defendant and Babcock parked their cars, and the defendant immediately went inside the house. Rajewski and Babcock lingered near Babcock's car, and, before they had the opportunity to go inside the house, Moulson, the defendant's former boyfriend, arrived and pulled his car into the driveway, shining the car's headlights on Babcock and Rajewski. Moulson exited his car, and he and Rajewski had a verbal and physical altercation that resulted in Rajewski striking Moulson and Moulson bleeding from his face.

During the altercation, the defendant was inside the house. One of the kids at the party came into the house saying that Rajewski and Moulson were there, and the defendant stepped back outside where she saw Moul-

son running toward the house with Rajewski and Babcock behind him. Moulson ran into the house to call the police, and the defendant told Babcock and Rajewski that Moulson was calling the police and that they should "get out of [there]." The defendant went back into the house and stood beside Moulson, trying to minister to his wound, while he called the police. Following the defendant's warning that Moulson was calling the police, Babcock and Rajewski left 18 Bunny Drive. Babcock dropped Rajewski off at his home, and then Babcock proceeded directly home himself.

Jonathan Baker, a Connecticut state trooper, received a dispatch to 18 Bunny Drive for an active disturbance at approximately 2:30 a.m.; he and another trooper responded. Baker spoke to Moulson in the presence of the defendant, and Moulson told Baker that, as he pulled into the driveway of the house, he was assaulted by two males, one of whom he identified as Rajewski. Moulson and the defendant gave Baker Rajewski's address, and Baker proceeded to that address to continue the investigation. The other trooper stayed at 18 Bunny Drive to continue speaking with Moulson, which resulted in Moulson being taken into custody in the presence of the defendant.

At Rajewski's residence, Baker knocked on the door and, when Rajewski answered, asked if Rajewski knew why he was there. Rajewski indicated that he did know why Baker was there and presented Baker with his cell phone, telling Baker he should read the text message conversation between the defendant and Rajewski. The text messages from the defendant notified Rajewski that the police were coming and instructed him to have blood on his clothes. Baker further testified that the defendant told Rajewski that Moulson reported to the police that Rajewski had attacked him while he was in his car but that the defendant's statement to the police was that Moulson was bloody when he got there because he was in a bar fight somewhere else. The defendant directed Rajewski to tell the police that Moulson stalks the defendant and Rajewski followed her to 18 Bunny Drive because he loves her. The defendant emphasized to Rajewski that they needed to stick with the same story, but Rajewski informed her that he was going to tell the truth that Moulson attacked Rajewski first. Based on his review of the text messages, Baker concluded that the defendant had requested that Rajewski lie to him.

While Baker was holding Rajewski's cell phone, Rajewski received a call from Babcock, and Baker answered the call at Rajewski's request, proceeding to have a conversation with Babcock. Baker asked Babcock if they could speak, and Babcock provided Baker with his home address with the understanding that Baker would be there shortly. Baker arrested Rajewski and took him to the state police barracks, and then

Baker went to see Babcock at Babcock's home. Baker took Babcock into custody as well and transported him to the barracks for processing. Later that morning, the defendant arrived at the barracks to pick up Moulson. At that time, Baker confronted the defendant about the text messages she had sent to Rajewski. The defendant told Baker that "it was autocorrect, spellcheck made her do that," and that the text messages were "taken out of context and her phone made her do it." Further, when Baker asked what her intent was with respect to the text messages, the defendant responded "that's not how I meant it." Baker placed the defendant under arrest on charges of tampering with a witness in violation of § 53a-151 (a) and interfering with a police officer in violation of General Statutes § 53a-167a. See footnote 6 of this opinion.

We note that the jury's verdict in the present case was also informed by the following testimony offered by the defendant at trial. The defendant testified that she did not tamper with a witness because she did not send the text messages to Rajewski at all. She denied sending the text messages to Rajewski, claiming that they were not sent from her phone or, if they were, that someone else had sent them. During cross-examination, the defendant denied that she was in a relationship with Rajewski at the time of the altercation with Moulson, claiming that their relationship spanned several months, at the most, from "April to like June-ish." When confronted with a signed statement she gave to the police[5] stating that she had been in a relationship with Rajewski until August, 2015, the defendant testified that she "may have made a mistake . . . ." Regardless of the timing of their relationship, the defendant was adamant that she was not in love with Rajewski either at the time of the altercation with Moulson or afterward. The state introduced into evidence a Facebook message that the defendant sent to Babcock on August 16, 2015, in which she said, "I love [Rajewski] with all my heart and would do anything for him! I'm sure [you] know he just broke up with me. . . . I'm sure you know I lied and said I saw [Moulson] get out of his car and go after [Rajewski] in court. . . . I'm sure [you] know I gave him 100 [percent] of me and loved him unconditionally when he was at his worst! [A]nd would give up everything I have to be with him . . . . [S]o I'm sure [you] know he broke my heart . . . . [P]lease tell him I will be here waiting. And he's my soulmate . . . . [H]e brought out the real me after being abused for [seven] years . . . ." When questioned about this message, however, the defendant once again denied knowing anything about it or having sent it. The defendant claimed, rather, that either the messages were not sent from her account but from a fake account that someone else set up, or that someone had hacked her account.

The jury returned a verdict of guilty of tampering with a witness in violation of § 53a-151 (a), and the trial

court imposed a sentence of one year of incarceration, execution suspended, and two years of probation.[6] The defendant appealed, claiming, inter alia, "that the evidence was insufficient to support her conviction of tampering with a witness. Specifically, she [argued] that the state failed to prove that she sent the text messages to Rajewski with the specific intent required for a conviction [under] § 53a-151 (a), that is, the intent to influence a witness at an official proceeding." (Footnote omitted.) *State* v. *Lamantia*, supra, 181 Conn. App. 663–64. The Appellate Court concluded that the "evidence established that the defendant was aware of Baker's investigation of the physical altercation involving Rajewski, Babcock, and Moulson." Id., 670. In addition, the Appellate Court stated that "[t]he jury could also find that the defendant, knowing that Baker investigated the physical altercation that had occurred at [18] Bunny [Drive] and had learned the identity of the participants, including Rajewski, believed that an official proceeding probably would result therefrom." Id. The Appellate Court, therefore, affirmed the witness tampering conviction, concluding that the jury reasonably could have found that the defendant tampered with Rajewski by sending him text messages shortly after his altercation with Moulson. Id., 669–70. This appeal followed.

We now turn to the defendant's claim that there was insufficient evidence for a jury to find that she specifically intended to interfere with a witness' testimony at an official proceeding. "When reviewing a sufficiency of the evidence claim, we do not attempt to weigh the credibility of the evidence offered at trial, nor do we purport to substitute our judgment for that of the jury." (Internal quotation marks omitted.) *State* v. *Ortiz*, 312 Conn. 551, 572, 93 A.3d 1128 (2014); see footnote 3 of this opinion. "[W]e construe the evidence in the light most favorable to sustaining the verdict. . . . We then determine whether the jury reasonably could have concluded that the evidence established the defendant's guilt beyond a reasonable doubt." (Citation omitted.) *State* v. *Elmer G.*, 333 Conn. 176, 183, 214 A.3d 852 (2019). "[W]e do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [finder of fact's] verdict of guilty." (Internal quotation marks omitted.) *State* v. *Crespo*, 317 Conn. 1, 17, 115 A.3d 447 (2015); see also *State* v. *Rodriguez*, 146 Conn. App. 99, 110, 75 A.3d 798 (defendant who asserts insufficiency claim bears arduous burden), cert. denied, 310 Conn. 948, 80 A.3d 906 (2013). When a claim of insufficient evidence turns on the appropriate interpretation of a statute, our review is plenary. See, e.g., *State* v. *Webster*, 308 Conn. 43, 51, 60 A.3d 259 (2013).

"A person is guilty of tampering with a witness if, believing that an official proceeding is pending or about

to be instituted, he [or she] induces or attempts to induce a witness to testify falsely . . . ." General Statutes § 53a-151 (a). "An 'official proceeding' is any proceeding held or which may be held before any legislative, judicial, administrative or other agency or official authorized to take evidence under oath, including any referee, hearing examiner, commissioner or notary or other person taking evidence in connection with any proceeding." General Statutes § 53a-146 (1). A " '[w]itness' is any person summoned, or who may be summoned, to give testimony in an official proceeding." General Statutes § 53a-146 (6). Section 53a-151 (a) applies to "any conduct that is intended to prompt a witness to testify falsely or refrain from testifying in an official proceeding that the perpetrator believes to be pending or imminent." *State* v. *Cavallo*, 200 Conn. 664, 668, 513 A.2d 646 (1986). Therefore, to support the defendant's conviction, the state had to demonstrate beyond a reasonable doubt that (1) the defendant believed that an official proceeding was pending or was about to be instituted at which Rajewski would likely be a witness, and (2) the defendant induced or attempted to induce Rajewski to testify falsely at that proceeding. See, e.g., *State* v. *Ortiz*, supra, 312 Conn. 554, 562; *State* v. *Pommer*, 110 Conn. App. 608, 614, 955 A.2d 637, cert. denied, 289 Conn. 951, 961 A.2d 418 (2008); *State* v. *Bennett-Gibson*, 84 Conn. App. 48, 52–53, 851 A.2d 1214, cert. denied, 271 Conn. 916, 859 A.2d 570 (2004). It is important to note that "[i]ntent may be, and usually is, inferred from the defendant's verbal or physical conduct. . . . Intent may also be inferred from the surrounding circumstances. . . . The use of inferences based on circumstantial evidence is necessary because direct evidence of the accused's state of mind is rarely available. . . . Furthermore, it is a permissible, albeit not a necessary or mandatory, inference that a defendant *intended the natural consequences of his voluntary conduct*." (Emphasis in original; internal quotation marks omitted.) *State* v. *Bennett-Gibson*, supra, 53.

An official proceeding that was pending or was about to be instituted includes not only those proceedings that have been initiated, but also those that are probable or "readily apt to come into existence or [to] be contemplated" by a defendant. (Emphasis omitted; internal quotation marks omitted.) *State* v. *Ortiz*, supra, 312 Conn. 570; *State* v. *Foreshaw*, 214 Conn. 540, 551, 572 A.2d 1006 (1990). "The crucial role police involvement would play in that process cannot be disputed"; *State* v. *Foreshaw*, supra, 551; and, as a result, "attempts to influence witnesses that happen to occur during a police investigation are [not] excluded from the purview of the statute," so long as "the defendant acts . . . believing that such a proceeding will probably occur . . . ." *State* v. *Ortiz*, supra, 570–72. In coming to that conclusion in *Ortiz*, this court analyzed the statutory

construction of § 53a-151 (a). Id., 561–67. We specifically considered whether, by not including the words "investigation," "inform," or "informant" as included in Model Penal Code § 241.6 (1), the legislature intended to exclude "situations in which the defendant seeks to prevent an individual from speaking with the police." (Internal quotation marks omitted.) Id., 568. "We agree[d] that the legislature restricted the scope of the witness tampering statute by omitting these words, but the scope of the restriction was minimal." Id. "[Section] 53a-151 (a) applies whenever the defendant believes that an official proceeding will probably occur, even if the police are only at the investigation stage."[7] (Emphasis omitted.) Id., 568–69. Furthermore, "[a]s long as the *defendant* believes that an official proceeding will probably occur, it does not matter whether an official proceeding is *actually* pending or is about to be instituted." (Emphasis in original.) Id., 569. This court has held that, "when [a] [defendant] knows that a witness with relevant information already has spoken with the police, a jury reasonably could infer that the [defendant] believed that the investigation probably would progress into an official proceeding." Id., 571; see also *State* v. *Pommer*, supra, 110 Conn. App. 619–20 (holding that jury reasonably could have inferred that defendant believed official proceeding was about to be instituted when defendant knew police were aware of identities of participants in robbery—one of whom was defendant— and eyewitness had provided that information to police).

In *Ortiz*, the court set forth two hypothetical scenarios that illustrate with precision the minimal nature of the restriction in instances in which the alleged witness tampering has occurred during the police investigation phase, before charges are brought or a suspect is arrested. First, "consider a scenario in which an individual commits a crime that results in no physical evidence, and in which the individual thereafter attempts to prevent the one witness to the crime from speaking to the police. The individual certainly could believe that the police would investigate the crime, but he would have no reason to believe that an official proceeding would probably occur because there would be no evidence or witnesses on which the police could rely to identify and arrest the individual.[8] In contrast, when an individual knows that there is significant evidence connecting him to the crime, or, even further, when the individual knows that a witness with relevant information already has spoken with the police, a jury reasonably could infer that the individual believed that the investigation probably would progress into an official proceeding." (Footnote added.) *State* v. *Ortiz*, supra, 312 Conn. 570– 71.[9] These two contrasting scenarios make clear that, when the facts demonstrate that the defendant was aware that there was significant evidence connecting him to the crime or that at least one witness had spoken

to the police, an attempt to tamper with witnesses during a police investigation falls under the purview of § 53a-151 (a).

The term "[w]itness," as defined by § 53a-146 (6), is broad, because it includes "any person summoned, or *who may be summoned*, to give testimony . . . ." (Emphasis added.) If the jury reasonably could find that the defendant knew that an individual had information relevant to the underlying crime, and knew that the individual "had provided a statement" to the police, it would be "reasonable for the jury to infer that the defendant believed that the [individual] probably would be called to testify in conformity with that statement at a future proceeding." (Internal quotation marks omitted.) *State* v. *Sabato*, 321 Conn. 729, 732, 748, 138 A.3d 895 (2016).

In the present case, the jury was presented with evidence that the defendant had more than mere knowledge of an investigation. The jury heard evidence that the defendant knew there had been a physical altercation between Moulson, Rajewski, and Babcock; observed head injuries on Moulson; was present when Moulson called 911 to report the assault; knew that Baker and the other responding state trooper were investigating the altercation; provided the state troopers with the name and home address of Rajewski; and was aware that the troopers had the names of all three men involved in the altercation. The defendant testified that she was present at 18 Bunny Drive at the time of the altercation, and, although she was inside of the house and did not see the start of the altercation, she saw Moulson running from Rajewski and Babcock and into the house with blood on Moulson's face. The defendant and Babcock testified that the defendant warned Rajewski and Babcock that Moulson was calling the police and instructed them to leave 18 Bunny Drive, further indicating that she knew they had been in an altercation and that the police had been summoned. The defendant and Moulson both confirmed that the defendant was present when Moulson called the police to report the incident, and Baker testified that the defendant was present while he spoke with Moulson. The defendant testified that she provided Baker with Rajewski's home address. Under these circumstances, a jury reasonably could conclude that the defendant (1) had knowledge of—and contributed to—the investigation, (2) knew there were—and identified for the police—witnesses to the incident, including herself, (3) knew there was physical evidence of the crime as evidenced by Moulson's injuries, and (4) knew that the police were taking the complaint seriously enough to track down witnesses in the middle of the night. On the basis of this evidence, the jury could reasonably infer that the defendant believed that the investigation probably would progress into an official proceeding.[10] See *State* v. *Ortiz*, supra, 312 Conn. 570–71.

In addition, the jury was presented with evidence, including the defendant's own testimony, that she knew that Baker was interested in contacting Rajewski regarding the altercation, and that he would probably be called as a witness. The defendant testified that, after Rajewski was identified as a participant in the altercation, she provided his address to Baker, who left 18 Bunny Drive to go to Rajewski's home. Rajewski testified that the defendant, knowing that Baker was en route to Rajewski's home, sent Rajewski text messages telling him to get away because the police were coming. Baker's testimony confirmed that the text messages from the defendant to Rajewski "essentially [said] the cops [were] coming, make sure you're bloody and . . . [Moulson was] abusive to her." Baker further testified that "[the defendant] want[ed] [Rajewski] to tell the police or [Baker] that [Moulson] stalks her. [The defendant] said [Moulson] was bloody when he got there. [The defendant] told [the troopers] that [Moulson] was in a bar fight somewhere else. And . . . [Rajewski] only followed [the defendant] to that residence [at 18 Bunny Drive] because he loves her." Baker also stated that the defendant told Rajewski "that they need to stick with the same story and it would be good. They have to match." Baker testified that Rajewski was upset with the defendant's text messages and told her "no, I'm telling the truth. [Moulson] tried to kick my ass, so I beat him up. And then . . . enough is enough." Baker further testified that the defendant responded that "[Rajewski's] story has to match [hers]. [Moulson] looks crazy. [Moulson] deserves it because of the beatings he's [done] to [her]." Baker testified that the crux of the text conversation was that the defendant wanted Rajewski to lie to the troopers, specifically, Baker. On the basis of this evidence, a jury reasonably could infer that, knowing that an official proceeding was probable, the defendant's text messages to Rajewski warning him that the police were coming, directing that Rajewski be bloody when Baker arrived, and providing Rajewski with a false narrative of events that matched the false information she allegedly gave to Baker, demonstrated a clear understanding by the defendant that Rajewski's testimony would be critical at a future proceeding. See *State* v. *Sabato*, supra, 321 Conn. 748 ("[i]ndeed, the defendant stated in one of those messages, 'it's YOUR statement that is gonna fuck it up,' thereby demonstrating the defendant's clear understanding that [the witness'] testimony would be critical at such a proceeding").

The same evidence introduced by the state to prove that the defendant believed an official proceeding was about to be instituted at which Rajewski would likely be a witness was also sufficient to allow the jury to infer that the defendant induced or attempted to induce Rajewski to testify falsely at that proceeding.[11] "[A] jury may consider a defendant's attempt to prevent an indi-

vidual from giving a statement to the police as evidence of [her] intent to influence the testimony of that individual at a future official proceeding. This conclusion is limited, of course, by the statutory requirements that (1) the defendant believe[d] an official proceeding [had] been or [was] about to be instituted, and (2) the individual probably [would] be called to testify at that proceeding." *State* v. *Ortiz*, supra, 312 Conn. 560. When these statutory requirements are met, it is reasonable to infer that the defendant "intended the natural consequences of [her] act, that is, to induce the [individual] to testify falsely at the [proceeding]." Id., 565. Furthermore, "it does not matter whether the police are at the investigation stage, the official proceeding stage, or any other stage; [so] long as the defendant acts with the intent to prevent a witness from testifying at an official proceeding, believing that such a proceeding will probably occur, the defendant has tampered with a witness within the meaning of § 53a-151 (a)." Id.; see also *State* v. *Pommer*, supra, 110 Conn. App. 618 ("[w]e reject the contention that discouraging the witness from speaking to the police could not suffice when there was evidence that the defendant believed an official proceeding was imminent").

The jury was presented with evidence that the defendant knew Rajewski had been involved in a physical altercation with Moulson and Babcock, Baker was actively investigating Moulson's complaint that he was assaulted by Rajewski and Babcock, and Baker was on his way to Rajewski's home to continue his investigation of the alleged assault on Moulson. Evidence was also presented that the defendant knew Rajewski was a critical witness to the investigation and that she instructed Rajewski on how to fabricate his statement to Baker so it matched hers.

As with the first element, the defendant's own testimony supported an inference that she attempted to induce Rajewski to testify falsely at a future official proceeding. This is not a case in which the defendant declined to take the stand to testify and the jury did not have the benefit of her version of events from which to assess her credibility or infer her intent. Nor did the defendant take the stand and testify, as she now claims on appeal, that she only wanted to protect Rajewski and to prevent him from being charged with assault because she loved him.[12] Instead, at trial, the defendant adamantly denied being in a relationship with Rajewski, being in love with him, and sending him any text messages the night of the altercation. She maintained these claims even when repeatedly impeached by her own conflicting testimony, official statements to the police, and incriminatory messages from her Facebook account. The jury obviously found the defendant to be dishonest and not credible because it rejected her claim that someone else had sent the text messages to Rajewski. In other words, the jury reasonably could have

concluded that the defendant had no qualms about perjuring herself on the witness stand and, from such a finding, could have inferred, in light of all the other evidence, that the defendant intended Rajewski to do the same thing when the time came. This undermines any suggestion that the defendant could not be presumed to have contemplated that Rajewski should lie at any trial that resulted from the police investigation of the altercation. The defendant's own testimony, coupled with all the other evidence, was sufficient to allow the jury to reasonably infer that the defendant attempted to induce Rajewski to testify falsely at a future official proceeding.[13]

In support of her claim, the defendant states that the required inference that she believed an official proceeding was about to be instituted was not reasonable because the underlying crime was assault and not murder, and "the probability of murder prosecutions resulting in trials is much higher than a garden variety G.A. prosecution . . . ."[14] We, however, find no precedent that stands for the proposition that varying levels of criminal severity alone determine a defendant's belief as to the probability of a future proceeding or whether it was reasonable for the jury to reach the same conclusion.[15] To the contrary, this court and the Appellate Court have upheld convictions for tampering with a witness related to a range of criminal and noncriminal activity. See footnote 14 of this opinion.

In addition, if the severity of the underlying crime were a determinative factor when deciding whether an official proceeding was probable, that could lead to unfortunate consequences by encouraging the very behavior the statute seeks to prevent. For example, considering the severity of the underlying crime could leave domestic violence victims vulnerable, because perpetrators could engage in manipulative or controlling behavior designed to prevent victims from being truthful with the police, without fear of being charged with tampering with a witness. While the state does not choose to prosecute every crime, and the state is more likely to prosecute some crimes than others, preempting tampering charges for crimes perceived to be less severe would shield a defendant from charges even when other evidence and surrounding circumstances clearly support a reasonable inference that a defendant believed an official proceeding was probable. This is the situation in the present case. Moulson testified that, as a result of the assault, he was "bleeding pretty severely" and needed "seven stitches in [his] eye." The defendant testified that she observed and initially tended to this injury while Moulson called 911. Even if we assume that Moulson's injury, which required professional, medical attention, was minor in nature—and we certainly recognize that it is less severe than other crimes including, but not limited to, murder—that fact was not presented to the jury in isolation. The defendant

did not have mere passing knowledge that Moulson had been assaulted, but, rather, she was present at the scene of the crime, witnessed the end and aftermath of the altercation, was involved in the police investigation, provided Rajewski's address to Baker, and knew the police were taking the allegations seriously as Baker left to immediately speak to Rajewski despite the early morning hour. Even considering the severity of the underlying crime, this evidence is sufficient for a jury to reasonably conclude that the defendant thought an official proceeding was probable.

In light of both the evidence presented at trial, including the defendant's own discredited testimony, and the reasonable inferences that could be drawn therefrom, we conclude that there was sufficient evidence for the jury to have found beyond a reasonable doubt that, at the time she sent text messages to Rajewski, the defendant (1) believed that an official proceeding was pending or was about to be instituted at which Rajewski would likely be a witness, and (2) induced or attempted to induce Rajewski to testify falsely at that proceeding. See *State* v. *Ortiz*, supra, 312 Conn. 554, 562. Therefore, the jury reasonably concluded that the defendant was guilty of tampering with a witness pursuant to § 53a-151 (a).

The judgment of the Appellate Court is affirmed.

In this opinion ROBINSON, C. J., and PALMER and MULLINS, Js., concurred.

* The listing of justices reflects their seniority status on this court as of the date of oral argument.

** September 3, 2020, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] At the time of trial, the defendant had changed her last name to Bernardi. For the purposes of this opinion, we continue to refer to her as Lamantia.

[2] This court granted the defendant's petition for certification to appeal, limited to the following issue: "Did the Appellate Court properly conclude that the evidence was sufficient to prove beyond a reasonable doubt that the defendant intended to induce a witness to testify falsely in an official proceeding that she believed to be pending or imminent, in violation of General Statutes § 53a-151 (a)?" (Internal quotation marks omitted.) *State* v. *Lamantia*, 330 Conn. 919, 194 A.3d 290 (2018).

[3] As the Appellate Court noted, "this case is replete with conflicting testimony regarding the timing and nature of the relationships between the various parties, as well as the events of the night of July 24, 2015, and the early morning of July 25, 2015. It was for the jury, and not this court, to resolve discrepancies in the testimony." *State* v. *Lamantia*, supra, 181 Conn. App. 650 n.1. We observe that one would be hard-pressed to find a criminal case without some degree of conflicting testimony and muddled motivations, and we emphasize that, "[n]otwithstanding our responsibility to examine the record scrupulously, it is well established that we may not substitute our judgment for that of the trial court when it comes to evaluating the credibility of a witness. . . . It is the exclusive province of the trier of fact to weigh conflicting testimony and make determinations of credibility, crediting some, all or none of any given witness' testimony. . . . Questions of whether to believe or to disbelieve a competent witness are beyond our review. As a reviewing court, we may not retry the case or pass on the credibility of witnesses. . . . We must defer to the trier of fact's assessment of the credibility of the witnesses that is made on the basis of its firsthand observation of their conduct, demeanor and attitude." (Internal quotation marks omitted.) *State* v. *DeMarco*, 311 Conn. 510, 519–20, 88 A.3d 491 (2014). The presence of conflicting testimony is the hallmark of an adversarial system, not the basis upon which to reverse the reasonable findings of a jury.

[4] In July, 2015, the defendant and Moulson lived together and may have also been in a relationship.

[5] The defendant became aware that Rajewski had stolen her credit cards in the two weeks prior to the events at issue in the present case. The defendant gave a statement to the police on October 21, 2015, in conjunction with her filing of a complaint against Rajewski alleging that he had stolen her credit cards, a crime for which Rajewski was arrested.

[6] The defendant was also convicted of interfering with a police officer in violation of § 53a-167a. The trial court imposed a concurrent sentence, as to that conviction, of one year of incarceration, execution suspended, and two years of probation. The defendant claimed on appeal that the evidence was insufficient to support her conviction of interfering with a police officer. *State* v. *Lamantia*, supra, 181 Conn. App. 653–54. The Appellate Court agreed with the defendant, concluding that there was insufficient evidence to sustain her conviction for interfering with a police officer, and remanded the case to the trial court with direction to render a judgment of acquittal on that charge and to resentence the defendant on the conviction of tampering with a witness. Id., 663, 671.

[7] It is well established that, in interpreting a statute, this court is bound by our prior constructions of the statute. See, e.g., *Kasica* v. *Columbia*, 309 Conn. 85, 93–94, 70 A.3d 1 (2013); *Hummel* v. *Marten Transport, Ltd.*, 282 Conn. 477, 494–95, 923 A.2d 657 (2007). We must presume that the legislature is aware not only of this rule of statutory construction, but also of our interpretation of § 53a-151 (a) in *Ortiz*. See, e.g., *State* v. *Courchesne*, 296 Conn. 622, 717, 998 A.2d 1 (2010). It is through this interpretive lens that we must view the legislature's determination to amend General Statutes § 53a-155, effective October 1, 2015, by adding a reference to a "criminal investigation conducted by a law enforcement agency," but failing to make a similar amendment at that time to § 53a-151 (a). See Public Acts 2015, No. 15-211, § 9. "Although we are aware that legislative inaction is not necessarily legislative affirmation . . . we also presume that the legislature is aware of [this court's] interpretation of a statute, and that its subsequent nonaction may be understood as a validation of that interpretation." (Internal quotation marks omitted.) *State* v. *Courchesne*, supra, 717. By choosing not to adopt changes to the language of § 53a-151 (a) that were proposed one year after our decision in *Ortiz*, we agree with the conclusion in Justice D'Auria's dissent that "we can infer that the legislature did not reject our interpretation in *Ortiz*, leaving *Ortiz* in place as good law . . . ." Put another way, in light of this court's interpretation of § 53a-151 (a) in *Ortiz*, which made clear that the omission of the term "investigation" effected only a minor limit on the scope of § 53a-151 (a); *State* v. *Ortiz*, supra, 312 Conn. 568–69; we must infer that the legislature, being aware of that interpretation, did not see any need to amend the statute.

[8] Just four months following its decision in *Ortiz*, this court considered under what circumstances a jury could reasonably infer that a defendant thought that an official proceeding was probable to support a conviction of tampering with physical evidence in violation of § 53a-155 (a). *State* v. *Jordan*, 314 Conn. 354, 376–79, 102 A.3d 1 (2014) (In considering whether defendant believed that official proceeding was pending or likely to be instituted, this court concluded that "§ 53-155 (a) applies, no matter what stage the police have *actually* reached in their investigation, as long as the defendant believes that it is *probable* that an official proceeding will arise. This interpretation is consistent with the commentary to the Model Penal Code . . . . It is also consistent with our interpretation of an identical phrase in . . . § 53a-151 (a)." (Citation omitted; emphasis in original; footnote omitted; internal quotation marks omitted.)). *Jordan* provided scenarios similar to those provided in *Ortiz*: "For instance, in a scenario in which an individual commits a crime with no witnesses, and he immediately thereafter discards the one piece of physical evidence connecting him to the crime, the individual certainly could believe that the police would investigate the crime, but he would have no reason to believe that an official proceeding would likely occur because there would be no evidence or witnesses upon which the police could rely to locate and arrest him. In contrast, when an individual knows that there is significant evidence connecting him to the crime, a jury reasonably could infer that the individual believed that the investigation probably would progress into an official proceeding. We emphasize, however, that it is not the existence of an investigation that is key but, rather, whether the defendant believes an official proceeding is pending or probable." (Footnote omitted.) Id., 382–83.

With those distinctions in mind, this court concluded in *Jordan* that the

defendant discarded the only physical evidence tying him to the crime and that there was no evidence that the police officer knew his identity or of any other information connecting him to the crime. Id., 386. In other words, at that point in time, the discarded physical evidence was the only evidence linking the defendant to the crime. Id. The defendant discarded it to prevent detection or to avoid being implicated in the crime *in the first instance*, and, without such evidence, the police would not know of his involvement in the crime. Id., 381, 384. These facts were similar to the first illustrative scenario outlined previously, and, therefore, a jury could not reasonably infer that the defendant believed that an official proceeding was probable. Id., 386.

*Jordan* is distinguishable from the present case. In the present case, the defendant claims that she attempted to convince Rajewski to lie to the police to help prevent him from being arrested and charged with assault. However, Rajewski had *already been implicated in the crime* by Moulson and the defendant, and Babcock was also aware of Rajewski's identity. Even without Rajewski's statement, the police would have known of his involvement in the assault. These facts more closely align with the second illustrative scenario posited by this court in both *Ortiz* and *Jordan*, whereas the facts in *Jordan* more closely align with the first scenario.

[9] Justice Ecker's dissent misconstrues this court's decision in *State* v. *Ortiz*, supra, 312 Conn. 551. That dissent states that, "[o]ur inquiry in *Ortiz* . . . ultimately and necessarily turned on the defendant's intent with respect to the official proceeding itself." The determination of whether the defendant believed that an official proceeding is pending or about to be instituted is not wholly independent of interference in a prearrest police investigation. A jury may consider a defendant's attempt to induce a potential witness to lie to the police during a prearrest investigation as evidence of his intent to affect that witness' conduct at a future, official proceeding. *State* v. *Ortiz*, supra, 564–65; see also *State* v. *Cavallo*, supra, 200 Conn. 673–74. It is immaterial whether a warrant has been issued or an arrest has been made, and "it does not matter whether the police are at the investigation stage, the official proceeding stage, or any other stage . . . ." *State* v. *Ortiz*, supra, 571.

[10] Justice Ecker's dissent takes umbrage at the state's assertion during closing arguments that it "had satisfied its burden of proof with respect to the defendant's belief that an official proceeding was pending or imminent because it had established that the defendant 'knew the cops were involved' and, therefore, '[c]learly . . . knew that a proceeding ha[d] been instituted,' " calling that argument an "egregious misstatement of law." A review of the state's closing argument relating to the witness tampering charge suggests that the state's argument contained more than a simple reference to knowing "the cops were involved," by accurately reciting the elements of the offense and the evidence the state felt proved both elements. Specifically, during that portion of the state's closing argument, it argued: "With regards to the charge of tampering with a witness, in order to prove that charge, the state needs to prove two elements, *the defendant believed that an official proceeding was about to be instituted and that* [*Rajewski*] *was likely to be a witness, and the defendant induced or attempted to induce him to testify falsely or with false testimony. This requirement, the requirement of the defendant believing an official proceeding was about to be instituted can be satisfied if the defendant knew that she could have been implicated in a crime and she asked, threatened, or induced a witness to withhold evidence from* [*the*] *police*. It does not matter that it was in the investigative phase of the criminal justice process. It doesn't matter that the police were still figuring out what happened. It just matters that she intended to prevent that witness from speaking with [the] police or [from] telling the police the truth.

"The state feels it has met its burden of proof with regards to both of these elements in that [the defendant] spoke with the police. She knew the cops were involved. She told them to leave, the cops were coming. She spoke with them at the home. Clearly, she knew that a proceeding has been instituted. Clearly, she knew an investigation was currently in the process. She knew [Rajewski] was likely to be a witness. How did she know this? By her own testimony, she gave the police [Rajewski's] name. [Moulson] knew that [Rajewski] was likely to be a witness because he told the police he was the one who assaulted him. As far as her inducing or attempting to induce a witness to testify falsely, you heard the officer testify to the text messages that she sent that night. Again, we'll get into that more later. She sent those text messages telling him, hey, this is my story, basically. This

is my story, this is what I told the cops. We need to match. This is what you need to tell them. [Rajewski] resisted. He said, no, let's just tell them the truth. Let's tell them the truth. This is what happened. No, our stories need to match. You need to tell them this. So, I feel the state has met its burden of proof with regards to both elements of this crime, and we will we be asking you find the defendant guilty." (Emphasis added.)

Viewed in its entirety, the state's closing argument relating to the witness tampering charge was not misleading. See, e.g., *State* v. *Felix R.*, 319 Conn. 1, 9, 124 A.3d 871 (2015) ("[w]hen reviewing the propriety of a prosecutor's statements, we do not scrutinize each individual comment in a vacuum but, rather, review the comments complained of in the context of the entire trial" (internal quotation marks omitted)). The state's argument was consistent with its theory of the case as articulated on the first day of trial, when the state's attorney noted that "the crux of the state's claim during the course of this case is going to be that [the defendant] lied to [the] police and attempted to get [Rajewski] to lie to [the] police in order to protect him and herself." The state's argument clearly places this case in the second scenario illustrated in *Ortiz*, described previously in this opinion, because, at the time the defendant tampered with a witness, she had knowledge of the existence of multiple witnesses and significant evidence. This is a perfectly permissible line of argument consistent with *Ortiz*. Even if the state had misstated the law during closing argument, the trial court properly instructed the jury on the essential elements of the offense, as the dissent concedes. Further, the court repeatedly instructed the jury, including prior to closing arguments, that, "[i]f in any way counsel makes a statement regarding the law that differs from what I instruct you on, it's what I say that counts." See, e.g., *State* v. *Williams*, 258 Conn. 1, 15 n.14, 778 A.2d 186 (2001) ("[i]t is a fundamental principle that jurors are presumed to follow the instructions given by the judge" (internal quotation marks omitted)). It is also important to note that the defendant did not challenge the claim that an official proceeding was probable. Rather, the defendant's theory of the case was that the text messages and witness tampering claims were fabricated by Rajewski in order to get the defendant in trouble because she previously had him arrested for stealing her credit cards.

[11] The defendant contends that, by sending the text messages to Rajewski, she was solely attempting to prevent Rajewski's arrest. The jury, however, "is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The trier may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . . This does not require that each subordinate conclusion established by or inferred from the evidence, or even from other inferences, be proved beyond a reasonable doubt . . . because this court has held that a [jury's] factual inferences that support a guilty verdict need only be reasonable. . . .

"[A]s we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the [jury], would have resulted in an acquittal." (Internal quotation marks omitted.) *State* v. *Seeley*, 326 Conn. 65, 72–73, 161 A.3d 1278 (2017).

[12] This may have been a closer case if the jury had not heard—and clearly discredited—the defendant's own testimony, in which she adamantly denied sending any text messages to Rajewski for any purpose, rather than claim, as she does on appeal, that she sent them to protect him. In essence, the defendant asks this court to determine that the jury could have reasonably inferred an intent from conduct that the defendant herself disavowed under oath at trial.

[13] Justice D'Auria contends that the defendant's trial testimony simply is irrelevant to the determination of whether the jury reasonably could have concluded that the defendant was attempting to induce Rajewski to testify falsely at a likely future prosecution, apparently because that testimony occurred sixteen months after the conduct at issue. We disagree with Justice D'Auria. Although the defendant did not testify directly about that element of the offense—instead, she falsely and repeatedly asserted that she did not try to corruptly influence Rajewski at all, an assertion that, for good reason, the jury rejected as incredible—her testimony at trial afforded the jury the opportunity to evaluate firsthand her demeanor, credibility, character, sophistication, and motive. For obvious reasons, all of these considerations are highly relevant to the ultimate determination of the defendant's intent when she urged Rajewski to lie to the police. This is particularly true because

state of mind is most often ascertained, as it was here, on the basis of inferences rather than direct evidence, and, so, the ability of the jury to assess the defendant's intent on the basis of her sworn testimony on the witness stand is an important factor supporting the jury's conclusion regarding that element of the offense. The fact that the defendant's testimony was given sixteen months after the events in question does not deprive that testimony of probative value with respect to what the defendant did or intended at that earlier date. Indeed, we are aware of no support in our case law, or anywhere else for that matter, for the proposition that testimony by a witness about past events is irrelevant to the jury's assessment of that witness' intent.

[14] In addition to her claim that the severity of the underlying crime should be a factor to consider, the defendant advances several additional arguments for which we conclude there is no legal basis. First, she claims that the required inference that Rajewski would likely be a witness at a future official proceeding was not reasonable because the case "may be resolved by means of nolle prosequi, diversionary programs, or a guilty plea," or, even if there were a trial, Rajewski could "[exercise] his [f]ifth [a]mendment right to not testify." (Internal quotation marks omitted.) Witness tampering charges may be brought in connection with any official proceeding, regardless of the seriousness of the underlying crime alleged in that proceeding, and the myriad possible future resolutions of the underlying charges are immaterial to a determination of whether the defendant believed an official proceeding was probable when he or she engaged in the alleged witness tampering conduct. See, e.g., *State* v. *Sabato*, supra, 321 Conn. 732 (defendant instructed friend not to cooperate with investigation of cell phone theft); *State* v. *Cavallo*, supra, 200 Conn. 665 (police officer tampered with likely witness at noncriminal arbitration proceeding). It is also immaterial whether there are circumstances that could excuse a potential witness from testifying at an official proceeding, including the investigation not resulting in an official proceeding. See, e.g., *State* v. *Ortiz*, supra, 312 Conn. 569 ("it does not matter whether an official proceeding is actually pending or is about to be instituted" (emphasis omitted)); see also *State* v. *Sabato*, supra, 732, 748 (it was reasonable for jury to infer that, when defendant knew that an individual had relayed relevant information to police, defendant believed that individual would likely be called to testify about that information at future proceeding).

Second, the defendant argues that she did not know how the assault allegations would be resolved because she was not a party to the underlying crime. Any individual—including, but not limited to, friends, family members, and associates—can engage in and be charged with tampering with a witness under § 53a-151 (a), and such charges are not restricted to the targets or defendants of the underlying proceeding. See, e.g., *State* v. *Bennett-Gibson*, supra, 84 Conn. App. 50–51 (sister of defendant in underlying sexual assault case was charged with tampering with witness when she attempted to induce witness to drop charges against her brother). Finally, the defendant claims that, even if the jury could reasonably infer that the defendant believed that Rajewski would be a witness at an official proceeding, the defendant's text messages were nonthreatening and intended merely to protect Rajewski. Any attempt to induce a witness to testify falsely, whether by force or otherwise, may result in witness tampering charges. See, e.g., id., 48 (sister of defendant offered to help witness with bills, obtain an apartment, or anything else necessary for witness to drop charges against her brother); *State* v. *Coleman*, 83 Conn. App. 672, 675–76, 851 A.2d 329 (defendant provided nonthreatening instruction on what witnesses were to say in order to create alibi for defendant), cert. denied, 271 Conn. 910, 859 A.2d 571 (2004), cert. denied, 544 U.S. 1050, 125 S. Ct. 2290, 161 L. Ed. 2d 1091 (2005).

Nor do we believe that tampering with a witness charges require the tamperer to benefit personally by avoiding criminal charges or a conviction, or that the defendant personally witness the underlying crime, arguments that were not raised by the defendant. We find no precedent to support either of these considerations. Even if being a witness to the underlying crime were a requirement—which it is not—in the absence of the alleged tampering, the defendant in the present case was nonetheless a witness to the underlying crime. If any of the participants in the altercation itself were charged, the defendant could have expected to be called as a witness. She was with Rajewski and Babcock immediately prior to their arrival at the location of the altercation and had a relationship with each of the parties. While she was in the home when the altercation began, she observed the end of it when she saw a bleeding Moulson running toward the house and away from Rajewski and Babcock, who were chasing Moulson.

_____